342 S.E.2d 422

**Robert Carl CRAIN, et al.**

v.

**Donald E. BORDENKIRCHER, Warden, etc.**

No. 16646.

Supreme Court of Appeals of West Virginia.

March 27, 1986.

James F. Companion, William D. Wilmoth, Barbara L. Baxter, Schrader, Stamp,

Byrd, Byrum & Companion, Wheeling, Daniel F. Hedges, Appalachian Research and Defense Fund, Charleston, and Patricia Valentino Kutsch, P.A., Wheeling, for appellants.

Charlie Brown, Atty. Gen., and Dana D. Davis, Asst. Atty. Gen., Charleston, for appellees.

MILLER, Chief Justice:

In this appeal by inmates at the West Virginia Penitentiary at Moundsville (WVP), we are asked to determine if the State's Compliance Plan approved by a special judge comports with the original findings and orders of the judge who heard the case. We find it does not.

This case originated in 1981 when Robert Crain, a prisoner at WVP, filed a habeas corpus petition in this Court alleging the conditions of confinement violated West Virginia statutory standards and were unconstitutional as cruel and unusual punishment. On June 10, 1981, we appointed the Honorable Arthur M. Recht of the First Judicial Circuit to conduct a hearing on the issue in the Circuit Court of Marshall County, Moundsville, West Virginia.

Similar petitions by other WVP inmates were consolidated and the action proceeded as a class action pursuant to Rule 23 of the West Virginia Rules of Civil Procedure. The named appellees are Donald Bordenkircher, as Warden, and Joseph McCoy, as Commissioner of the Department of Corrections.[1]

Prior to trial, Judge Recht, accompanied by counsel for both sides, made a three-and-one-half-hour tour of the facilities at WVP. After extensive discovery and numerous pretrial conferences, trial began on February 15, 1982, and concluded on February 27, 1982.

At issue at the trial were the physical conditions at WVP and virtually every policy and procedure by which the penitentiary is operated and maintained. Appellants alleged their confinement at the 120-year-old facility constituted cruel and unusual treatment in violation of the Eighth Amendment to the Constitution of the United States and Article III, Section 5 of the Constitution of West Virginia. A number of facts were stipulated, and during the trial the testimony concentrated on receiving specific complaints from inmates, personnel at WVP including the appellees, and experts. This testimony related to all aspects of the conditions at WVP, including the health, safety, welfare, and rehabilitation of the entire inmate population.

After trial, the parties agreed to a Consent Decree that encompassed the revision of various prison policies and the appointment of a Special Master whose duties would be to monitor the implementation of and compliance with the final decree.

On June 21, 1983, the circuit court issued a seventy-five page Memorandum of Opinion, Findings of Fact, Conclusions of Law, and Order in which it detailed the numerous deficiencies that when considered in their totality rendered the conditions of confinement at WVP unconstitutional. The court ordered the Department of Corrections to submit within 180 days a plan to remedy various deficiencies and to bring the totality of conditions up to constitutional standards. The court also incorporated the Consent Decree as part of its Order. It is important to note that the Department of Corrections did not appeal this Order. Thus, the court's findings as to the unconstitutional conditions are not at issue in this appeal and we term this order as the "Final Order."

In the fall of 1983, Judge Recht resigned from the bench and was replaced in this case by Special Judge John F. Bronson. The Department submitted its Compliance Plan to Judge Bronson who, on September 1, 1984, approved it over appellants' objections. Appellants appealed asking this Court to reverse those portions of Judge Bronson's order that approve the parts of the Department's Compliance Plan that do not meet the requirements of the Final Order, and asking this Court to modify that

1. Jerry Hedrick now serves as Warden and A.V. Dodrill serves as Commissioner.

Plan so that it will comply with constitutional and statutory standards.

## I.

### INTRODUCTION

It is difficult to accurately summarize the deplorable conditions that were found to exist at WVP. Throughout this opinion, we refer to certain specific findings made by Judge Recht in order to give a factual background to discuss aspects of the Compliance Plan. These represent only a small portion of those facts that made up the "totality of conditions" which were found to render the penitentiary unconstitutional in his Final Order.

The existing facilities are a conglomerate of structures beginning with the first constructions in the 1860's followed by additions built in 1908 and 1923, which Judge Recht found are badly deteriorated by reason of age and lack of maintenance. This conclusion is borne out in several legislative studies that are referred to later in this opinion.

Voluminous testimony was taken to outline the conditions. Inmates testified as to the deteriorated condition of the in-cell plumbing such that when an inmate in an adjoining cell flushes his toilet, the sewage will back up into the adjoining cell's toilet. Leaking and overflow of toilets onto the cell floor is not uncommon. Pigeons and sparrows roost in the cell tiers gaining access through broken windows and permeate the area with their droppings.

Temperature control is inadequate causing freezing temperatures in some cell areas in winter and extremely hot conditions in the summer. Because of lack of ventilation and cleanliness and sewage spills, much of the living facility is permeated with a stench. Fire and safety hazards abound and are compounded by numerous health hazards in the food service area. Food is contaminated with hair, insects, and other foreign substances.[2]

Two expert witnesses who toured the facilities and reviewed the extensive documents developed in this case were appalled as to the existing conditions. They commented on the lack of meaningful recreational facilities, rehabilitative programs, and the pervasive idleness that resulted in the inmates being kept in their cells for extended periods each day. The lack of sufficient lighting in the cells made even reading difficult to idle time away. Both were dubious that renovation of the existing facility would be economically feasible.

One of the experts, Michael Mahoney,[3] gave this summary of the overall conditions: "I would describe them as grossly inadequate, substantially below minimum constitutional standards. And I would have to personally describe the West Virginia Penitentiary as the worst correctional maximum security facility I've ever visit-

2. Since the trial in 1982, the Special Master has periodically reported on conditions at WVP. His report for the period ending April 9, 1985, showed a safety consultant identified thirty-three violations of the Occupational Health and Safety Act, Title 29, U.S.C., twenty-one of which were "serious" violations. He also reported that according to the Director of Maintenance there has been no noticeable reduction in vermin and insects. A strong odor of pigeon dung permeates many offices throughout the new administration building. During an inspection of the break areas the Special Master found decaying food and a pool of maggots in an area adjoining the water cooler/fountain. If cleaned up, he reported, the maggot-infested sludge would have filled several gallon buckets. Air temperatures in some of the cell areas had readings of thirty-eight degrees Fahrenheit. He reported a section of the kitchen ceiling had fallen, due apparently to moisture, and found two inches of sewer water on two areas of the kitchen floor. He reported vermin in the food storage and meat coolers and observed rodent feces and rodent entry into dried food stuffs. He reported that some inmates had to sleep on the tier floor because there were not enough cells, and that these inmates would have to cover themselves with plastic garbage bags to shield themselves from the droppings of several dozen birds that nested in the rafters above them.

3. Mr. Mahoney is the executive director of the John Howard Association, a private foundation established in 1901 and located in Chicago, Illinois. It does research, monitoring, and consultation with regard to prison conditions. He has worked in numerous positions in the corrections field and has been associated with the Chicago office of the National Council on Crime and Delinquency. He holds a master's degree and lectures at Chicago State University.

ed." The other expert, Michael Lane,[4] concluded in this fashion: "The most dismal overall conditions that I have ever seen in a facility anywhere, that I have been under any circumstances."[5] Finally, we observe that even Warden Bordenkircher testified that "I have always said ... do not spend a nickel on that old one hundred and fifteen year old facility. It is a waste of our money."

■ There is no dispute that habeas corpus is an appropriate remedy to test the constitutionality of the conditions of confinement, as we stated in Syllabus Point 1 of *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (1982):

" ' "Habeas corpus lies to secure relief from conditions of imprisonment which constitute cruel and unusual punishment in violation of the provisions of Article III, Section 5, of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States." Syllabus point 1, *State ex rel. Pingley v. Coiner*, 155 W.Va. 591, 186 S.E.2d 220 (1972).' Syllabus Point 1, *State ex rel. K.W. v. Werner*, W.Va. [161 W.Va. 192], 242 S.E.2d 907 (1978)."

■ It is important to note from the outset that Judge Recht's ultimate conclusion was that the "totality of conditions" at WVP rendered confinement there cruel and unusual punishment. We have recognized this point in Syllabus Point 2 of *Hickson:*

"Certain conditions of jail confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article III, Section 5 of the West Virginia Constitution."

The totality of conditions assessment of constitutional compliance has received broad acceptance by the federal courts. *See Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Dawson v. Kendrick*, 527 F.Supp. 1252, 1285 (S.D.W.Va.1981); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976), aff'd as modified sub nom., *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), rev'd in part on other grounds sub nom., *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), cert. denied sub nom, *Newman v. Alabama*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), aff'd and remanded, 442 F.2d 304 (8th Cir.1971). In *Dawson v. Kendrick*, 527 F.Supp. at 1285, the court said of the totality of conditions analysis, "Properly applied, such an analysis requires that each thread in the fabric of challenged conditions be isolated, yet judged with an appreciation of its interdependent existence."

Although the circuit court essentially applied a totality of conditions analysis, it also found several discrete constitutional violations that, independent of all other conditions of confinement, must be corrected to satisfy distinct constitutional standards, which we term the "Discrete Violations."

In the following discussion, we will review the various components of the Final Order and will examine the Compliance Plan to determine whether it comports with the Final Order. We will first examine those discrete deficiencies found in the Compliance Plan's remedies and, secondly, examine whether the Compliance Plan renders the "totality of conditions" constitutional.

4. Mr. Lane is the Director of the Illinois Department of Corrections which is in charge of thirteen adult correctional facilities which house some 14,000 inmates. He is a consultant for the National Institute of Corrections.

5. Mr. Lane was particularly upset over what he observed in what was termed the psychiatric ward in the infirmary area which had to be entered by unlocking a door off a hallway. It contained a toilet area and a dark cell from which somebody stuck his hand out. Mr. Lane, who said that without a flashlight he could not see in the cell, asked if there was a toilet in the cell and the person inside said no.

## II. DISCRETE VIOLATIONS

### A. *Food Service and Facilities, Nutrition*

The Final Order determined that WVP failed to provide and maintain adequate and sanitary food service facilities, and that preparing, serving, and eating food in the main dining hall is not carried out in a sanitary fashion. Among the specific findings were that the kitchen floor is generally dirty, with water leaking from the floor above. An open sewer frequently backs up and overflows onto the kitchen floor. Food storage areas are infested with vermin. Cooking pots and utensils are stored near an open sewer. Inmate workers in the kitchen are not given even the rudiments of sanitary food handling or proper kitchen uniforms, such that human hair, insects, and foreign particles are found in the food. Trays and utensils used by segregated inmates (i.e., those required to eat in their cells) are cleaned with a rag and stored on a picnic table. The same rag is used to clean the picnic table, then recycled for tray and utensil cleaning. One inmate testified he performed the dual role of cook and janitor, wearing the same clothing for both jobs.

It was also found that the food is prepared and served without the guidance and direction of either a dietitian or nutritionist, but instead, food service is directed by correctional officers. Consequently, according to the Final Order, no inmate receives a nutritionally balanced meal. No provision is made for portion control, menus are not followed, meals intended to be hot are served cold, and special diets are not served for persons with medical problems such as diabetes, high blood pressure, heart disease, or ulcers.

The Final Order stated that the failure to maintain an adequate and sanitary food service facility to provide inmates with nutritional and caloric necessities constitutes a constitutional deprivation and that there was no legitimate governmental goal being served by such substandard food service. Furthermore, it was also held that it is a specific constitutional violation not to pro-vide adequate and palatable special diets to inmates with medical problems.

In *Dawson v. Kendrick*, 527 F.Supp. 1252, 1297–98 (S.D.W.Va.1981), a case involving the Mercer County Jail, the court considered:

"Food sufficient to meet minimum nutritional needs is a basic necessity of life. The failure to provide adequate and sanitary food service facilities and to serve food sufficient to meet minimum nutritional needs may give rise to a constitutional deprivation. *See Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980); *Bolding v. Holshouser*, 575 F.2d 461, 468 (4th Cir.1978), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978); *Dimarzo v. Cahill*, 575 F.2d 15, 19 (1st Cir.1978), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978)."

*See also Pugh v. Locke*, 406 F.Supp. at 334; *Lightfoot v. Walker*, 486 F.Supp. 504, 512, 528 (S.D.Ill.1980).

The Department's Compliance Plan proposed to build a new kitchen and dining facility to be completed during fiscal year 1985–86. In the meantime, the Plan calls for improved ventilation, screens on the kitchen windows, and a new pest extermination contract.

The Plan also calls for a food service contract with a private vendor who will plan, prepare, and serve meals under the supervision and direction of its own dietitian and nutritionist, and that special diets will be prepared as prescribed by a physician. Hot meals and individually wrapped utensils will be delivered to inmates in segregated cells.

The appellants complain the Department did not hire a qualified staff nutritionist or dietitian and that the food service contract specifies that a consulting dietitian visit the institution only bi-monthly, and, therefore, there is no supervision of the preparation of meals. They also complain there are no adequate provisions in the Plan for cleanliness.

■ We find that, with respect to food service and facilities, the Compliance Plan adequately comports with the Final Order.

The new kitchen facility will alleviate the plumbing problems and other unsanitary conditions. The contract with the private food service calls for direction and supervision of a nutritionist "or other qualified food service employee," and for a dietitian to provide special diets for inmates with medical problems. Contrary to the appellants' contention, the Final Order did not require the Department to hire a staff nutritionist or dietitian.

Although the Compliance Plan, as drafted, meets the requirements of the Final Order with regard to food service, the Special Master, appointed by Judge Bronson pursuant to the Consent Decree, found numerous violations and substantial evidence that the Department is not fully implementing its plan. For example, food preparation is not "regularly supervised by a dietitian" as the Plan requires; menus are not being published; food quality is poor and balanced meals are not being served; and special diets are not being provided to in-mates with medical problems. These issues are not properly before this Court as they are issues of fact that are more appropriate for a trial in the circuit court.[6]

## B. *Discipline and Due Process*

In the Final Order two distinct constitutional violations were found in WVP's internal disciplinary policies. First, under prison rules at the time, inmates could be confined to administrative segregation, which involves significant deprivation of privileges for an indefinite period of time after being charged with an offense and before a finding of guilt. This was possible because hearings could be continued indefinitely and no time period was specified within which the internal hearing officer, termed a magistrate, must have rendered a decision. Second, inmates were denied due process rights when transferred to a more restrictive classification.

After analyzing the law,[7] the Final Order concluded that when an inmate is accused

---

6. The appellants have raised a number of issues regarding the Department's failure to implement the Compliance Plan. They refer to various reports made by the Special Master that found numerous instances of noncompliance. As we explain in part IV, *infra,* these are factual issues, some of which are disputed by the appellees. In order to resolve them, a hearing and findings made by the trial judge are needed. *See, e.g., Nelson v. Collins,* 659 F.2d 420, 422 (4th Cir.1981); *Mobile County Jail Inmates v. Purvis,* 551 F.Supp. 92 (S.D.Ala.1982), *aff'd,* 703 F.2d 580 (11th Cir.1983); *Miller v. Carson,* 550 F.Supp. 543 (M.D.Fla.1982); *Palmigiano v. Garrahy,* 448 F.Supp. 659 (D.R.I.1978).

7. Judge Recht aptly summarized the law as follows:

"It has long been recognized in West Virginia that a prisoner retains basic due process guarantees despite incarceration. (See *Tasker v. Mohn,* [165 W.Va. 55] 267 S.E.2d 183 (1980) which provided that due process is required within the context of a parole hearing; *State ex rel. Gillespie v. Kendrick,* [164 W.Va. 599] 265 S.E.2d 537 (1980), which provided that due process is necessary when good time credit is sought to be revoked either in jail or in prison; *Watson v. Whyte,* [162 W.Va. 26, 245 S.E.2d 916 (1978) ], which provided that due process is required in an attempt to transfer a prisoner from one restricted environment to one which is more restricted.)

"Quite possibly the case that requires a re-examination of Rules 6, 7 and 8 of the Rules and Regulations Governing Inmates is *Tasker*

*v. Griffith,* 160 W.Va. 739, 238 S.E.2d 229 (1977), which provided that due process safeguards are applicable to procedures involved in removing an inmate from the general prison population and placing him in administrative segregation.. *Tasker v. Griffith,* supra. concluded by stating that 'internal transfer from restrictive environment to a more restrictive environment inside the prison requires due process protection'.

"As recited in the Findings, supra., page 22, it is conceivable that an inmate may be confined to Administrative Segregation for an indefinite period of time after being charged with an offense and prior to a finding of guilt.

"Courts, which have addressed this same situation, have repeatedly held that there must be a specific articulated reason for prior segregation in light of the inmate's constitutional right not to be segregated (and thus punished) until proven guilty. See *Drayton v. Robinson,* 519 F.Supp. 545 (D.C.Pa.1981); *Goldsby v. Carnes,* 429 F.Supp. 370 (D.C.Mo. 1977); *Barnes v. Gov't of Virgin Islands,* 415 F.Supp. 1218 (D.C.V.I.1976).

"However, in those limited situations where pre-hearing segregation is permissible, e.g. *Tasker v. Griffith,* supra., due process continues to require limitations on that period of time in which segregation is permitted to exist. In *Drayton v. Robinson,* supra. the court provided that a hearing should be held within five (5) days. In *Sykes v. Kreiger,* 451 F.Supp. 421 (D.C.Ohio 1975) the court held that a hearing should be held within thirty-six (36) hours."

of a rule violation there must be a maximum time period within which a hearing should be conducted and a decision rendered.

The Compliance Plan refers to a revised Policy Directive No. 670.00, dated August 1, 1983, that requires the magistrate to conduct a hearing within five regular business days after the accused has been served with a Violation Report.[8] The Plan states the magistrate is required to render a decision within three days, although the Policy Directive does not set such a deadline.

The appellants' complaint in this regard is that, according to the Compliance Plan, the five-day limit for a hearing can be extended under "limited circumstances," and that such "limited circumstances" are not defined.

█ It appears the appellants have misunderstood that the Compliance Plan is further refined by its reference to Policy Directive No. 670.00 which establishes in Section 4.08 that the hearing must be held within five days after service of the viola-

tion notice unless continued for good cause on motion by one of the parties. A continuance for good cause is a valid procedure to enable the parties to prepare for a hearing. *See State ex rel. Bowen v. Flowers*, 155 W.Va. 389, 184 S.E.2d 611 (1971). This is not to say that the good cause continuance can be abusively used to delay the hearing.

The appellants also complain that the Compliance Plan with its incorporation of Policy Directive No. 670.00 permits prehearing detention for other than emergency reasons. In Syllabus Point 3 of *Tasker v. Griffith*, 160 W.Va. 739, 238 S.E.2d 229 (1977), we said: "No prisoner may be confined in administrative segregation for investigation into alleged misconduct, unless the safety of the institution or the integrity of the investigation would be jeopardized by having the prisoner remain at large in the inmate population."

█ When we view the applicable language of Policy Directive No. 670.00, we believe that it does conform with the *Tasker* mandate.[9] Under Policy Directive No. 670.00, disciplinary infractions are divided

8.  Section 4.08 of the West Virginia Department of Corrections Policy Directive No. 670.00, August 1, 1983, provides:
    "4.08  *Scheduling Hearings*
    a) The Magistrate shall schedule a hearing on the charge before the inmate is served with a copy of the Violation Report.
    b) Hearings shall be scheduled no sooner than twenty-four hours and no later than the fifth regular business day after the accused inmate has been served with the Violation Report.
    c) A hearing may be postponed by the Magistrate but only if the accused inmate or staff moves for a continuance only for good cause. The Magistrate shall render all decisions on motions for continuances in writing, stating the reasons for the decision therein.
    d) No hearing shall be continued beyond the tenth regular business day after the accused has been served with the Violation Report. Thereafter, the inmate, if in detention, shall be released."

9.  The relevant portions of Policy Directive No. 670.00 are Sections 4.04 and 4.05:
    "4.04  *Detention of the Inmate Before Charging*—Before an inmate is served with a Violation Report charging him with a violation he may be placed in detention by the chief correctional officer or shift commander, but *only* if the officer or commander believes:

a) On the basis of either an Incident Report or verbal information that an inmate has violated a Class One rule,
b) An investigation is needed to determine whether the inmate is responsible for a particular violation of a Class Two rule and that detention of the inmate is necessary to insure the objectivity of the investigation, *or*
c) The circumstances of the violation are such as to present a probability of injury to the inmate himself, to other people, or to property.
Any inmate so placed in detention shall not be detained for longer than seventy-two hours unless he is served with a Violation Report charging him with a rule violation pursuant to Section 4.03.
"4.05  *Detention of the Inmate Before Hearing*
a) An inmate who has been served with a Violation Report charging him with a Class One rule violation may be placed in detention pending the outcome of the case.
b) An inmate who has been served with a Violation Report charging him with a Class Two rule violation may be placed in detention if, in the judgment of the shift commander, the inmate poses a continuing substantial risk of injury to himself, other people or property."

into three classes of which Class I is the most severe. It is defined generally as "[o]ffenses ... which threaten life or limb, which seriously breach institutional security, or which are felonies." There is included a list of specific offenses such as escape, assault, rape, and riot. Clearly the Class I offenses are those that jeopardize the safety of the institution and its inmates and other personnel and would permit prehearing segregation under *Tasker*.

The other related issue involves the due process rights of inmates being reclassified to a more restrictive (non-punitive) living environment. The Final Order reminded the Department that it had not yet submitted nor implemented a plan to comply with the mandates of a 1981 opinion by Judge Recht in *Parks v. Bordenkircher*, Civil Action No. 81–C–319 R, Circuit Court of Marshall County. In that case, which was not appealed, the circuit court held that inmates were entitled to due process before they could be reclassified to a more restrictive living environment.[10]

■ Although we do not have before us the facts that were involved in *Parks v. Bordenkircher*, the parties appear to agree that the standards set out in *Parks* are for administrative reclassification or reassign-ment and do not involve disciplinary procedures that are handled under Policy Directive No. 670.00. As we have previously pointed out, these rules do comport with the guidelines set out in *Tasker*, which permits more restrictive segregation before a hearing if the safety of the members of the institution or the integrity of the disciplinary investigation would be jeopardized. Viewed from this aspect, we believe *Parks'* guidelines are acceptable and basically comport with Syllabus Point 1 of *Harrah v. Leverette*, 165 W.Va. 665, 271 S.E.2d 322 (1980).[11]

The Commissioner argues that the sixth step in *Parks* which delays effectuating the assignment until the procedural steps are exhausted should not be applied. We disagree as we believe in the ordinary administrative reclassification the inmate poses no threat to the institution. If such a threat does exist, it would seem to fall under some disciplinary infraction which would trigger Policy Directive No. 670.00. In the specific instances cited by the Commissioner involving the need to protect an inmate from injury from fellow inmates, we would assume the inmate would gladly cooperate on his assignment to protective

**10.** The six due process requirements dictated in *Parks v. Bordenkircher* are as follows:

"This Court finds that the prison authorities should have the opportunity to devise and formulate the mechanics of a system which should assure the following minimum standards:

"(1) A written notice setting forth the intention of the institution to reclassify or reassign the inmate from a housing unit to a more restricted housing unit;

"(2) The written notice should contain the reasons why the institution has elected to reclassify or reassign the inmate to a more restrictive housing unit;

"(3) An opportunity to be heard before a neutral and detached hearing body within a reasonable period of time following receipt of the written notice setting forth the intentions and reasons for the reclassification or reassignment;

"(4) The requirement of a written statement by the neutral and detached hearing body as to the evidence called on and reasons for any adverse action designed to implement the original intention to transfer;

"(5) The right to appeal the decision of the neutral and detached hearing body to a neu-tral and detached officer appointed by the Warden;

"(6) The requirement that no reclassification or reassignment shall take place until all procedural safeguards are exhausted."

**11.** *Harrah* is useful by way of analogy since it dealt with a disciplinary hearing. Its Syllabus Point 1 states:

"Due process requirements for prison disciplinary hearings are:

"(a) Written notice to the inmate of the claimed violation;

"(b) Disclosure to him of the evidence against him;

"(c) Opportunity to be heard and to present witnesses and documentary evidence;

"(d) The right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);

"(e) A neutral and detached hearing body;

"(f) A written statement by the factfinders of the evidence relied on and reasons for discipline; and

"(g) The right to counsel if the state is represented by a lawyer."

348

custody. Even if he were uncooperative, *Tasker* would enable a prehearing transfer to protect the safety of the inmate. Other courts have sanctioned this result. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ We find that Policy Directive No. 670.00 of August 1, 1983, is consistent with constitutional requirements and complies with the Final Order in all but one respect. The Policy Directive must be amended to provide that the magistrate render a decision on all charges within three days of the conclusion of the hearing. Saturdays, Sundays, and legal holidays shall be included when calculating the three days. This amendment will make the policy consistent with the Compliance Plan.

Therefore, subject to the three-day requirement noted above, we find the Department's Compliance Plan is in accord with the Final Order regarding internal discipline and transfer procedures.

### C. *Medical, Dental, Psychiatric Care*

The Final Order found, "[t]here are grave and systemic deficiencies in the health care delivery system at the Penitentiary. The personnel, facilities, equipment, and the care and treatment of inmates are all inadequate." The specific deficiencies were found as follows:

"(1) There is no full-time physician to organize an effective health care structure, adhering to a well-designed series of health protocols; (2) there is no full-time, qualified staff with a registered nurse in charge of each shift; (3) there is a substantial reliance on inmate staffing without proper supervision and training; (4) the inmate staff has access to confidential inmate medical records; (5) there is a totally inadequate receiving and screening system which would permit those who are in need of treatment to assure that they would receive it in an orderly fashion; (6) there is no adequate pharmacy or qualified pharmacist; (7) there are gross deficiencies in the maintenance and preparation of medical records; (8) there is no cardio-pulmonary resuscitation training for Penitentiary personnel; (9) inmates in punitive and administrative segregation are not treated on a regular basis; (10) there is an absence of therapeutic diets; (11) the physical facilities are grossly inadequate to assure delivery of proper health care; (12) there is inadequate psychiatric and psychological treatment both in terms of facilities and personnel, so that inmates with problems involving alcohol and drug abuse, emotional disturbances, mental illness, and mental retardation are virtually ignored; and (13) dental care is either non-existent, or delayed to such an extent to be considered non-existent."

According to the Final Order, these conditions "present potentially dangerous physical and emotional suffering in violation of Art. III, Sec. 5 of the West Virginia Constitution and the Eighth Amendment to the United States Constitution." The Compliance Plan commits the Department to remedying only some of these deficiencies, and consequently, the appellants argue that each deficiency must be corrected. The Department contends that the Final Order did not mandate any specific remedy and that the combination of all health care factors with the improvements specified in the Compliance Plan meets constitutional standards.

It appears the Department has misstated the degree of improvement required by the Final Order. In its brief, the Department said, "Judge Recht was concerned only that the penitentiary provide 'a modicum of detection, diagnosis and treatment of the medical, mental and dental needs of the inmate population.' ... The appellees' plan accomplishes this purpose." That is not what the Final Order required since it found that "the evidence is compelling that fundamental medical, dental, and mental needs of the inmates at the Penitentiary are not being met." It said the list of inadequacies only "assures 'a modicum of detection, diagnosis and treatment.'" *Quoting Dawson v. Kendrick*, 527 F.Supp. 1252, 1308 (S.D.W.Va.1981). In other words, as in *Dawson v. Kendrick*, a "modicum" of care was not enough. The Depart-

ment essentially admits its Compliance Plan only provides the modicum. We agree.

Of the thirteen specific deficiencies found in the Final Order, the Compliance Plan is in full accord with the following: (1) A nurse will be on duty twenty-four hours a day; (2) Inmate staff will no longer have access to inmate medical records; (3) Medical record keeping will be improved by the hiring of an additional records clerk; (4) All staff were to have been trained in CPR by the end of fiscal year 1984–85; and (5) Special diets will be served to inmates with medical problems.

The Compliance Plan appears to offer partial improvement in the following areas: (1) The Final Order had found the pharmacy facilities and services provided before the Compliance Plan were inadequate. The Plan offers no improvements to the facilities and only increases the pharmacist's duties to two half-days per week; and (2) Although the Compliance Plan promises improvement in the rendering of mental health care, including hiring a psychiatrist for twenty hours per month, a part-time psychologist, and other qualified and trained counselors, the Department admits it cannot meet the needs of the mentally ill and retarded inmates.

The Department states that even though W.Va.Code, 28–5–31, enables inmates to be transferred to mental health facilities, in practice it is unable to do so because of the reluctance and inability of the Department of Health to maintain and treat these individuals in its facilities. We find this argument to be without merit. It borders on incredulity to assert that in the face of a mandatory legislative enactment, those charged with carrying out its mandate would refuse to do so.

To correct what the Final Order found to be "non-existent" dental care, the Compliance Plan only adds one dental hygienist. Although this may enable the dentist to devote his time to more serious dental problems, we are not able to determine this fact because the Compliance Plan does not specify how many hours per week the dental hygienist will be providing services.

The Compliance Plan fails to address five deficiencies listed in the Final Order: (1) There is no plan to hire a full-time physician to organize an effective health care structure; (2) There is no plan to eliminate reliance on untrained and unsupervised inmate staff; (3) The Plan does not address the inadequate receiving and screening system; (4) The Plan does not address the special problem of inadequate health care of inmates in punitive and administrative segregation; and (5) There are no plans to improve the medical care facilities.

We agree with the Department that it is not necessary to provide the best possible health care to inmates as long as the health care system at WVP, when viewed in its totality, comports with constitutional standards.

The basic standard set by the United States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260 (1976), is "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." (Citation omitted). This standard has been applied in other prison condition cases where the extent of the lack of adequate health care was similar to the case at hand. *See Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977), *aff'd sub nom. Todaro v. Coughlin*, 652 F.2d 54 (2d Cir.1981); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979); *Dawson v. Kendrick*, 527 F.Supp. at 1306; *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir.1977); *Newman v. Alabama*, 503 F.2d 1320, 1330–32 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Lightfoot v. Walker*, 486 F.Supp. 504 (S.D.Ill.1980).

We must then determine whether the Compliance Plan, if implemented, would improve health care sufficiently that it would no longer show a "deliberate indifference to serious medical needs." Despite the Department's efforts to improve the quality of health care, the fact remains that there is no plan for a full-time physician to organize and oversee the health care services; inadequate plans to care for the mentally

ill, retarded, and segregated inmates; no plan to improve medical facilities; no plan to improve the receiving and screening system; continued reliance on untrained inmates to perform medical procedures; and inadequate plans to provide proper dental care.

■ Most of these deficiencies can be corrected without an inordinate economic burden on the State. We, therefore, hold that health care at WVP, even assuming full implementation of the Compliance Plan as approved, constitutes deliberate indifference to the serious medical needs of the prisoners, and we order the Department to submit a revised plan in accordance with Part IV, *infra*, that, at a minimum, includes: (1) the hiring of a full-time physician to organize and oversee all health care at WVP; (2) the elimination of the reliance on untrained inmate staff to perform medical procedures; (3) a detailed protocol for receiving and screening inmates on a regular basis; (4) a detailed plan for providing adequate dental care; (5) a plan for at least minimal treatment for the mentally ill and retarded inmates; (6) a plan to improve health care to segregated inmates; (7) a plan to correct deficiencies in the medical facilities; and (8) the retention of the plans already approved.

### D.  *Law Library*

The Final Order contained the following findings of fact:

"Adequacy of the law library as well as access to the library fall below any known acceptable standards. The library itself is woefully inadequate in regard to the books available. Those, which are available, are at least four years out-dated, and thus are essentially worthless. Due to the physical limitations of the Penitentiary, only ten (10) inmates are permitted to use the law library at any one time, causing a waiting period of from seven to ten days for an inmate to gain access to the library.

"Those inmates confined to North Hall, including those in administrative segregation, do not have any direct access to the law library. Each inmate must rely on an inmate clerk to retrieve cases and conduct other legal research, and there have been occasions when a correctional officer on duty has either denied or delayed the inmate clerk access to the inmate who is in need of legal assistance. The 'legal office' in North Hall is a five by seven foot cell containing one worn typewriter with no typing paper. The cell has a malfunctioning commode, filled with human excrement, which creates a foul odor."

The Final Order determined that such conditions deprived inmates of their constitutional rights to have adequate, effective, and meaningful access to the courts. *See State ex rel. McCamic v. McCoy,* 166 W.Va. 572, 276 S.E.2d 534 (1981). *See also Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The Final Order directed the facilities to be improved to give access to more inmates in the general population of inmates. It noted the United States Supreme Court in *Bounds v. Smith* approved a library plan that enabled inmates to use the library on an average of one full day, every three to four weeks. The Final Order required reasonable access to the law library for inmates in punitive segregation, with accommodations for adequate facilities, legal assistants, and equipment.

The Compliance Plan calls for expanding and updating the library's collection of law books; keeping the library open eight hours per day, seven days per week; training inmate law clerks twice a year; and making more typewriters and typing rooms available. The Plan does not include a new facility, because of space limitation, until the new Dining Hall is built. Thus, the library can accommodate only ten inmates at a time. The plan also includes hiring more guards to enable segregated inmates to be escorted to the library three times a week.

The appellants contend the Compliance Plan should not have been approved because it does not provide for an increase in available space to accommodate more in-

mates until 1987, after the new Dining Hall is constructed. Under the Plan, according to the appellants, only one-third to one-half of the inmates have access to the library every three weeks. That is significantly below the frequency approved in *Bounds v. Smith.*

■ We find the Compliance Plan is in accordance with the Final Order regarding the law library in all but one respect: the Plan fails to provide inmates with adequate time to use the library. The Department's excuse is that it has no room for physical expansion of the library facility. If that is the case, then the warden must extend the library's hours. We believe it is not unreasonable to require the law library to be open twelve hours per day until a new law library is provided that accommodates substantially more than ten inmates at a time. The Department states in its brief that the new facility will enable each inmate to use the library one full day every three or four weeks. We will hold the Department to that promise, but will not establish such frequency as a constitutional minimum.

### E. Conditions of Administrative Segregation

The Final Order held that inmates confined to administrative segregation (those not adjudged of a prison rule violation) cannot be treated in the same manner as inmates confined to disciplinary segregation (those who have been found guilty of a prison rule violation). Specifically noted were three areas in which no distinctions were made between these two classifications:[12] (1) area and condition of housing; (2) conditions under which an inmate may leave his cell; and (3) institutional privileges.

Subsequent to the Final Order in *Bishop v. McCoy,* 174 W.Va. 99, 323 S.E.2d 140 (1984), we discussed requirements regarding administrative segregation and came to a similar conclusion in Syllabus Point 4, which states, in part, that it is the duty of

the Commissioner of the West Virginia Department of Corrections to:

"(2) ensure that all protective custody inmates, whether of the West Virginia Penitentiary at Moundsville or otherwise, shall, in continuing their rehabilitation, be entitled to the same educational, vocational, recreational and other program opportunities to which other prison inmates in this State are entitled and (3) ensure that no prison inmate under the supervision of the West Virginia Department of Corrections who is not a maximum security inmate is transferred, solely for the purpose of placing that inmate in protective custody, to a maximum security institution."

The Compliance Plan shows that the only difference in treatment is that inmates in administrative segregation are permitted to use the telephone daily and are allowed to have their own radio and television, while inmates in punitive segregation may not use the telephone, may not have a radio, and may use a television only for educational purposes. All other privileges and restrictions are identical. The Plan, therefore, only makes distinctions in regard to privileges, but not in regard to the other two problems specifically identified in the Final Order.

The Department argues that the loss of telephone, radio, and television privileges constitutes a substantial difference in treatment because of the extraordinarily high value inmates place on these privileges. In addition, the Department notes in its brief, although not in the Compliance Plan, that inmates in administrative segregation are allowed to visit the infirmary to receive medical attention and are also eligible to participate in the privileged visitation program that permits contact visitation. These privileges are not available to inmates in punitive segregation.

We find the Compliance Plan adequately complies with the Final Order where it makes distinctions regarding privileges,

---

12. This problem was highlighted at trial when the warden's executive assistant in charge of the segregation unit, Colonel John Fromhart, testified that it took him two weeks to determine which inmates were classified as administratively segregated and which were classified as punitively segregated. Certainly greater distinctions are in order.

but it fails to make distinctions with regard to area and conditions of housing and with regard to conditions under which an inmate may leave his cell. Although the Department's brief states inmates in administrative segregation have the additional privilege of visiting the infirmary, the Compliance Plan submitted to Judge Bronson did not make that distinction clear, and we, therefore, order that such a policy be incorporated into the Compliance Plan. Other distinctions must be made with respect to visitation time, out-of-cell time, and exercise time. By this we do not imply or condone that these distinctions be accomplished by making more restrictions on those inmates in disciplinary segregation.

The Department also states in its brief that inmates in administrative segregation are eligible for contact visitation. This policy is not outlined in the Compliance Plan submitted to Judge Bronson. In fact, Staff Notice # CDG204, dated July 18, 1983, which was issued pursuant to the Final Order, and which regulates inmate visitation, explicitly excludes inmates in administrative segregation from contact visitation. According to the regulation, contact visitation is permitted only to inmates in the Honor Category Classification who have a rating of Trusty, Minimum, or Medium.

We, therefore, order the Department to revise its Compliance Plan to reflect its policy with regard to contact visitation for segregated inmates.

We also order the Department to make some meaningful distinction in the area and conditions of housing between inmates in administrative segregation and inmates in punitive segregation.

Finally, the administratively segregated inmate is entitled to other institutional privileges which include the educational, vocational, recreational, and other programs that the general population enjoys. The amended Compliance Plan in this area will be submitted in accordance with Part IV.

## III.  TOTALITY OF CONDITIONS

In addition to the preceding discrete constitutional violations, the Final Order made several other findings of fact and conclusions of law regarding other aspects of WVP, which in their effect on living conditions, and in combination with the other discrete constitutional violations, constitute cruel and unusual punishment. Although neither the Eighth Amendment to the United States Constitution nor Article III, Section 5 of the West Virginia Constitution defines acceptable living standards for prison inmates, we must be guided as outlined in the Final Order by prevailing standards of decency to determine how the State must treat its criminals. In *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958), the United States Supreme Court said the content of the Eighth Amendment is not static but "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." In *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–71, 57 L.Ed.2d 522, 531 (1978), the United States Supreme Court said the Eighth Amendment "prohibits penalties that are grossly disproportionate ... as well as those that transgress today's ' "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." ' *Estelle v. Gamble*, [429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 258 (1976) ], quoting *Jackson v. Bishop*, 404 F.2d 571, 579 [ (8th Cir.1968) ]." We have adopted these standards in construing our Constitution and in our cases. *See, e.g., Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (1982); *Cooper v. Gwinn*, 171 W.Va. 245, ——, 298 S.E.2d 781, 792 (1981); *State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907 (1978); *State v. Houston*, 166 W.Va. 202, 273 S.E.2d 375 (1980); *State v. Vance*, 164 W.Va. 216, 262 S.E.2d 423 (1980); *State ex rel. Pingley v. Coiner*, 155 W.Va. 591, 186 S.E.2d 220 (1972).[13]

13.  With regard to the *Pingley* case, Judge Recht stated:

"Finally, this Court is not unmindful of the opinion of the West Virginia Supreme Court in *State ex rel. Pingley v. Coiner*, 155 W.Va.

591, 186 S.E.2d 220 (1972), which held that although existing conditions at the West Virginia Penitentiary were unpleasant, confining, severe, harsh, restrictive and repressive, those conditions, as shown by the evidence, did not

It is beyond dispute that the substandard conditions at WVP tragically reflect upon the degree of our civilization. Recognizing the overall conditions at WVP fell well below contemporary civilized standards, the Final Order properly held the totality of conditions there were unconstitutional. The circuit court was not alone in its assessment of the conditions at WVP. Several years before the Final Order, the Joint Committee on Government and Finance had toured WVP, had consulted with experts, and had arrived at the same conclusion. The following are excerpts from their final report dated January 11, 1982:

"The West Virginia Penitentiary was first completed in 1863 and has been added onto since—the newest addition was constructed in 1929. Over the years lack of proper maintenance and normal wear have resulted in severe physical plant problems. These problems now interfere with the normal operation of the prison, and confinement conditions for the inmates are far from adequate.

"There have been attempts to upgrade the penitentiary and improve conditions. Since 1970, $4.5 million has been spent for various improvements and renovations at the prison; a considerable portion of these funds were provided by the federal government. These band-aid approaches, however, have fallen short of providing for acceptable confinement conditions.

\* \* \* \* \* \*

"The Subcommittee on Penal Construction first visited the West Virginia Penitentiary in June 1980. An inspection revealed that the institution was in very poor condition. Most plumbing was dilapidated, and electrical problems caused serious hazards. The basement area, used for classrooms, was nearly unfit to use. Inmates complained bitterly about the conditions.

"Over a year later, the Subcommittee visited the prison again. The problems had become even more severe. The basement had been ordered closed by the penitentiary physician, and the plumbing had deteriorated even further. Added to these problems was the 1980 State Fire Marshal's inspection report on the penitentiary. He found it clearly in violation of numerous fire code regulations. Donald Bordenkircher, Warden at the prison, estimated that $7.2 million would be necessary to comply with the changes called for by the Fire Marshal. Few changes have been made to comply with the report."

Among the committee's conclusions were the following:

"There is a critical need for action to address the problems. Due to the lack of upkeep and neglect, the penitentiary is not only difficult to operate and keep secure but is an impossible environment to even attempt the rehabilitation of inmates. . . .

". . . The Governor should include $10 million in his Fiscal Year 1983 budget for the beginning phase of construction and renovation at the West Virginia Penitentiary. This figure could be altered depending upon further changes of architectural plans for the project.

\* \* \* \* \* \*

". . . Although improvement of the facility will be completed in phases, the Subcommittee recommends that the complete plans be drawn by an architectural firm for the entire construction and renovation program at the penitentiary. These complete plans will provide continuity in the construction process and ensure that the operation of the institution is not interrupted to a great extent.

". . . The Department of Corrections should develop a plan for the establishment of more comprehensive rehabilita-

---

constitute cruel and unusual punishment within Art. III, Sec. 5 of the Constitution of West Virginia, and the Eighth Amendment to the United States Constitution.

"The distinction between *Pingley* and the case *sub judice* is measured not only by the passage of more than ten years, but it is also

factually distinguishable based upon more than two weeks of testimony including the opinion of two nationally renowned penal experts. While *Pingley* found no evidence to support an unconstitutional condition, this record is replete with sufficiently compelling evidence to warrant an opposite conclusion."

tion programs for inmates at the West Virginia Penitentiary. Advantage should be taken of the increased space that will be created by the construction and renovation. The Subcommittee is strongly committed to the need for rehabilitation programs and urges that a plan for such programs be completed before the renovation and construction has begun."

The foregoing findings are reinforced by an even more recent legislative report by the. Senate Select Committee on the West Virginia Penitentiary which was formed "to investigate the causes of the January 1, 1986 riot at the West Virginia Penitentiary and subsequent unrest." West Virginia Legislature Senate Journal, Sixty-Seventh Legislature, Regular Session, 1986, March 6, 1986 p. 106, et seq. Among the problems identified were these:

"All correction officials with whom we spoke felt that there was a need to provide ways to occupy inmates so that they would have less free time to devote to destructive activities. The penitentiary is certainly lacking in programs whether they be recreation, hobbies, or education. Policies regarding inmate accessibility to what few programs exist are also insufficient and inconsistent. There was also concern expressed by some of those testifying regarding particular programs which were not effectively or properly administered and in some cases made intentionally inaccessible." Id. at 107.

Among the recommendations contained in the report were these:

"Physical facilities at the West Virginia Penitentiary are dilapidated and obsolete. Although the Committee does not have a recommendation regarding a replacement facility, we do recommend that the possibility of a replacement facility, or facilities, including previous studies be considered during ·the Legislative interim session and recommendations be made to the Legislature prior to the 1987 session as to the renovation and reconstruction needs with emphasis on the methods of financing. It is the further recommendation of the Committee that the suggested renovation and reconstruction be commenced no later than January 1, 1988. Legislation to provide for this study is being reported to the Senate." Id. at 110.[14]

The Department has improved several aspects found to contribute to the overall unconstitutional conditions. The appellants make no complaint regarding the Department's plan to improve its visitation policy and visitation facilities and are satisfied with the Department's revised policies regarding good-time credits, correspondence, and telephone privileges. However, the appellants are not satisfied that the ·Compliance Plan adequately comports with the Final Order on the three major factors that contribute to the overall unconstitutional conditions. They contend the Compliance Plan inadequately addresses the needs for recreation, rehabilitation, and new physical facilities, including more living space for inmates.

### A. Recreation/Exercise

The Final Order determined that WVP offers little in the way of programmed activities to alleviate boredom and idleness. The principle recreation area is outdoors and thus impractical for use during inclement weather. It has no accessible toilets so inmates must use a hole in the ground near the drinking fountain. The recreation area offers weight lifting, a basketball court with two hoops, and a handball court. Only one basketball and one football are available to the entire General Population. Some baseball bats and balls are also available.

Inmates in North Hall and restricted housing do not have access to the main yard, but have their own very limited out-

---

**14.** The recent prisoners' revolt resulting in tragic murders, taking of guards, and the backlash of prison guard discontent are manifestations of the execrable living conditions that affect both prisoner and guard. The Final Order aptly pointed out more than two years before the New Year's Day, 1986, prisoners' revolt, "It is the expectation of this court that once the systemic changes contemplated by this decision occur, the tensions which often prompt violence or threats of violence will similarly dissipate." Since the Final Order of June 21, 1983, living conditions at WVP have remained relatively unchanged.

door area equipped only with a bent basketball hoop, a deflated basketball, a limited number of weights, and a boxing bag. No indoor recreational facility has been provided since the indoor gym was closed in 1979 and converted to a dormitory.

These deficiencies were held to contribute to the totality of unconstitutional conditions of confinement, and that "[a]n integral part in a program of rehabilitation and self-improvement is the creation of an atmosphere that avoids physical, mental, and social degeneration. Such an atmosphere must include planned and organized recreation with adequate space, equipment and time."

The Compliance Plan includes: (1) hiring two full-time Recreation Directors to organize programmed activities; (2) installing a "Universal" bodybuilding station in the main yard and restoring the North Hall unit; (3) repairing existing basketball hoops; (4) installing an outdoor lighting system to permit outdoor recreation after dark; (5) installing three plumbed commodes and two drinking fountains in the yard; (6) resuming use of the gymnasium for recreation; (7) converting the Old Men's Colony (OMC) into a gymnasium or building a new gymnasium for inmates in North Hall; and (8) resurfacing and restriping the outdoor basketball court and handball court. The Department also plans to ask the telephone companies to contribute .02 percent of the revenues generated through the inmate telephone system as a means to raise funds to purchase athletic equipment. Other than that, the Department claims it has no funds for equipment "[d]ue to anomalies of the strict categorization of appropriations."

The appellants complain that, under the Plan, indoor recreation will not be available to inmates in North Hall until 1988–89, and that there will be no indoor recreational facility for inmates in protective custody, hospital, special project unit, and OMC, which accounts for 24.9 percent of the population. They also complain the Compliance Plan does not include any repairs to the gymnasium, which the inmates claim is dilapidated and hazardous. The appellants also criticize the Department for not providing athletic equipment from its own funds. Finally, the inmates complain that those in disciplinary segregation and protective custody may only exercise out of their cells one hour every day, and that, in practice, these inmates may only leave their cells once every three days.

The Department contends its plan to improve recreation satisfies constitutional standards. It relies on *Miller v. Carson*, 563 F.2d 741 (5th Cir.1977), and *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir.1975), for the proposition that lack of exercise rises to the level of constitutional significance only when it causes an impairment of health. The Department argues that there was no evidence at trial to prove any impairments of health resulting from its recreational deficiencies.

It is unnecessary for us to determine whether WVP's recreational program meets any specific constitutional standard. The Final Order did not find the recreational deficiencies to be a discrete constitutional violation, but, instead, determined it was a factor that rendered the totality of conditions at WVP unconstitutional. Hence, our determination of whether the improvements in the recreational program satisfy the Final Order must be made in the context of the entire Compliance Plan. When the totality of conditions in a penal institution violates the Constitution the court's remedies are not limited to the redress of specific constitutional rights. *See Miller v. Carson*, 563 F.2d at 751; *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir.1974). In *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.1977), the court affirmed the actions of the district court designed to provide inmates with reasonable recreational facilities because "such facilities may play an important role in extirpating the effects of the conditions which undisputably prevailed in these prisons."

We find the improvements in the recreation and exercise program as outlined in the Compliance Plan fall short of the Final Order. The Order required "adequate space, equipment, and time" for

recreation and exercise. Indoor recreation space is not available to all inmates, and that which is used is dilapidated and hazardous. There is far too little equipment for such a large population, and the plan to ask telephone companies to contribute money for equipment has neither a guarantee of success nor a timetable for implementation.

We find the Compliance Plan is not adequate to relieve the boredom and idleness of the inmates. It does not provide the "atmosphere that avoids physical, mental and social degeneration," as the Final Order required. A revised Compliance Plan will be necessary in this area and should be submitted in accordance with Part IV.

### B. Rehabilitation, Education, Classification

The Final Order required the Department to comply with this Court's ruling in *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981), wherein we held the Department has a statutory obligation to establish and maintain programs of classification, education, and treatment of inmates, and that such programs must comply with the standards established by the American Correctional Association and the Commission on Accreditation for Corrections [hereinafter "ACA Standards"].[15]

The Final Order concluded that there was virtually no ongoing academic and vocational educational programs at WVP. It said, "The entire Penitentiary is characterized by massive and pervasive idleness."

The Department, in its Consent Decree, agreed to adopt the standards as required by *Cooper v. Gwinn*, and presented to Judge Bronson its Compliance Plan, which detailed how the Department was to implement the ACA Standards. The Plan is extensive and comprehensive, and, for the most part, in compliance with ACA Standards.

The appellants complain the Compliance Plan fails, in some aspects, to conform with ACA Standards, that the Department is not implementing the Plan as required, and that the Department has made no plans for periodic review to evaluate and confirm compliance with ACA Standards.

■■■ In its brief, the Department has agreed to enter into a contract with an independent expert at least every three years to evaluate and confirm continued compliance with ACA Standards. We hereby order that such a review requirement be detailed in the amended Compliance Plan.

The appellants complain the Department relies heavily on the use of videotaped instruction for all inmates, and exclusively for some classifications of inmates, and that such reliance on videotape violates ACA Standard 2–4427 which requires instructional programs to provide "the same interaction, feedback, and personal attention as students in educational ... programs outside the institution." Furthermore, ACA Standard 2–4214 says inmates in administrative segregation as a result of behavioral problems should receive programs conducive to their well-being.

The Department points out that ACA Standard 2–4214 also states that for inmates in administrative segregation, "access to programs is not to be interpreted as an entitlement to all programs or privileges afforded the general population." The Department argues that institutional security justifies restrictions on inmates in administrative segregation from participating in all educational programs to the same extent as the general population. The Department's Compliance Plan provides for some personalized instruction to inmates in the segregation units, but the appellants charge that

---

15. This Court held in *Cooper v. Gwinn*, 171 W.Va. at 259, 298 S.E.2d at 795:

"In summary, we hold that inherent in the republican form of government established by our State Constitution is a concept of due process which insures that the people receive the benefit of legislative enactments. The Legislature has provided that rehabilitation is the primary purpose of confinement in state prisons, and has specified that programs of classification, education and treatment must be implemented in furtherance of that policy. The Department of Corrections is the government agency responsible for implementing the policy specified by the Legislature. It has not fulfilled its policy mandate and the petitioners have no other adequate remedy to enforce their rights."

the overreliance on videotaped programs "does little more than provide the appearance of an attempt by the appellees to establish a real rehabilitation program for the inmates." The Compliance Plan does not specify how often personalized instruction will occur or the duration or format of such tutorial sessions.

We are guided by various sections of the ACA Standards. Section 2–4427 states, "There [must be] a systematic approach to determine the personnel requirements for the academic and vocational programs *to ensure all inmates access to staff and services.* (Essential)." (Emphasis added). Section 2–4422 requires a "comprehensive education program available to all eligible inmates," and that "[i]ndividual instruction should be *supplemented* by the use of programmed instruction, teaching machines, educational television and correspondence courses when appropriate." (Emphasis added).

■■■ As we have previously stated, there must be made a marked distinction between those inmates held in administrative segregation and those held in disciplinary segregation with regard to their rights to penitentiary rehabilitative programs. Without more details regarding the extent of the personalized instructions available to segregated inmates, we are not assured that segregated inmates have adequate "access to staff and services" as required by Section 2–4427. Nor are we assured for even the general population that individual instruction is only supplemented, instead of replaced by, the videotapes, as required by Section 2–4422. Therefore, we find Judge Bronson erred in approving this aspect of the Compliance Plan, and we order the Department to amend the Compliance Plan with details of the personalized instruction that is to be provided.

■■■ The appellants also complain that the Compliance Plan does not provide adequate vocational apprenticeship programs. The original Compliance Plan called for twelve apprenticeship programs, but Judge Bronson approved a revised plan that reduced the apprenticeship programs to four

and that allowed only up to five inmates to participate in each program. We find this severe reduction in the apprenticeship programs to be unacceptable and contrary to the spirit of *Cooper v. Gwinn.* As a consequence, the Department should revise its Compliance Plan in this area.

The appellants also complain that inmates are not being properly classified according to the mandates of *Cooper v. Gwinn.* They contend that because of the space limitations of the Department's medium and minimum security facilities, nearly fifty percent of all State prisoners are assigned to WVP regardless of the need for such custodial control. They argue that "[a]s long as there persists a shortage of living space at the State's correctional facilities, the final arbiter of an inmate's custodial assignment will remain 'based solely on what space is available rather than a considered evaluation of … what best would facilitate the inmate's productive return to society,'" *citing Anderson v. Redman,* 429 F.Supp. 1105, 1122 (D.Del.1977).

The Compliance Plan states the Department's goals as follows: "The Department is committed to the maintaining of each inmate in the least restrictive security setting and custody status that is necessary for the protection of society and the safe and efficient operation of the Department." In Section 3, Policy Directive 664.00, July 19, 1985, the Department's policy states, "maximum and, to some extent, close custodies should be reserved for inmates who have demonstrated through past behavior and by careful staff evaluation that they are a serious threat to the public and/or to the safety and security of the institution."

The Department admits in its Compliance Plan that, "Like correctional facilities across the country, both the Huttonsville Correctional Center and the Penitentiary have operated at or close to capacity, depending on the season, number of new commitments, paroles, etc. The Department shall not make classification decisions based upon the population pressures at either institution, except in cases of extreme emergency."

Whether inmates are being improperly assigned to WVP is a question of fact and is outside the scope of this appeal. We believe the Compliance Plan comports with the Final Order on the issue of classification, but we stress that population pressures at other facilities alone, without other extenuating circumstances, is not an "extreme emergency" that permits the Department to assign inmates to WVP under the Compliance Plan regardless of the custodial control required.

The remainder of the appellants' complaints on the issues of rehabilitation, education, and classification are based on findings by the Special Master that show the Department is not following its Compliance Plan. Those issues are not properly before this Court as they involve issues of fact not yet tried.

### C.  *Physical Environment*

The greatest problem that exists at WVP is the deteriorated condition of the physical facility. This is a matter that we have generally touched upon in the earlier portions of this opinion. Much of what the circuit court found was independently corroborated by the "Feasibility Study: West Virginia Penitentiary," prepared for the Joint Committee on Government and Finance of the West Virginia Legislature by L. Robert Kimball & Associates, dated December 5, 1981, and which is part of the record in this case. The Final Order described these conditions in its findings of fact as follows:

### *"1.  Insufficient Living Space.*

"All living quarters consist of cells which are generally 5′ × 7′. In the main line population and North Hall, each cell is occupied by a single inmate. In the restricted housing unit, however, many of the cells are occupied by two (2) inmates, as a result of an insufficient number of cells to accommodate those who either desire or need to reside in these units.

"In a typical cell throughout the Penitentiary, regardless if it is in North Hall, General Population or Restricted Housing, sixty percent (60%) of the floor space is occupied by a bunk, commode and sink.

"The majority of inmates in the General Population are confined to their cells on an average of seventeen (17)—eighteen (18) hours per day, except during those periods when the entire institution is in a 'locked-down' status. During the period of 'locked-down', an inmate is not permitted to leave his cell at any time.

"Inmates in the punitive and administrative segregation (North Hall) are confined to their cells an average of twenty-three (23) hours per day.

"The current living arrangement of thirty-five (35) square feet, sixty percent of which is occupied by fixtures and furnishings, falls below accepted standards of minimum space 'to call one's own'.

### *"2.  Vermin and Insects.*

"The entire inmate living and eating areas are vermin-infested. Living and eating areas are not only plagued with live rats and mice, but also with all of the problems associated with these rodents, including the proliferation of rat feces, rat poisoning and dead rats with lice and fleas.

"In addition to these noxious animals, maggots, roaches and water bugs are found throughout the Penitentiary.

"Efforts to either eradicate or control this problem have been unsuccessful.

### *"3.  Plumbing, Heating and Ventilation.*

"The plumbing throughout the Penitentiary is unsanitary, inadequate and poses an imminent danger to public health.

"Raw sewage and water leak from the sewer and water pipes in the 'break areas' which separate the blocks of tiers. The sewage and water thus flows into adjacent cells, while malfunctioning commodes in many cells have overflowed causing toilet waste to back-up in the sinks.

"Shower areas throughout the Penitentiary have not been maintained in a clean, sanitary and safe condition, with the absence of hot water being the rule rather than the exception. No showerheads or nozzles are attached to the system which

ostensibly delivers what is referred to as a shower.

"The faucets in many. of the sinks in the cells run continuously with efforts to stop the flow being unsuccessful.

"No attempts have been made to install a safe, sanitary and adequate system of plumbing. Instead, there has been a weak effort to repair on an *ad hoc* basis using untrained labor and inferior materials and supplies. For example, wooden plugs are used to plug holes in pipes which are constantly 'blowing out', allowing the leakage of sewage and water. The plumbing deficiency can only be remedied by the replacement of the entire system as acknowledged by Warden Bordenkircher.

"The heating and ventilation system throughout the Penitentiary is antiquated, and not capable of assuring minimally adequate heat and ventilation. Ventilation equipment is frequently not in use, so that during the summer months, odors, excessive heat and humidity are unbearable. The temperature in some of the cells has risen as high as 110 degrees fahrenheit during the summer months.

"The lack of adequate ventilation produces stagnant air. This staleness, coupled with the continued presence of contaminants and a lack of adequate displacement of body heat, causes personal discomfort as well as health and sanitary problems.

"The heating system for the cell blocks is accomplished by steam flowing through pipes which are in a state of constant disrepair. The heating system is totally inadequate resulting in temperatures recorded in the winter months as low as 28 degrees fahrenheit in some areas. To compensate for the lack of adequate heat, many inmates are forced to wear layers of clothing, topped by sheets, topped by blankets, and topped by outer wear.

"The heating and ventilation system is frequently erratic and unregulated, resulting in some areas in restricted housing being so hot that it is described as a 'sweat box' even during the winter months.

## "4. Adequate, Safe and Healthful Illumination.

"Natural and artificial lighting is inadequate making it unsafe for inmates to read in their cells. In order to turn the lights on or off, an inmate must unscrew the bulb, due to the absence of any light switches.

"There is exposed electrical wiring in the area separating the blocks of tiers ('break-area'), with water constantly leaking onto the exposed wires. The wiring system throughout the Penitentiary is overloaded, with constant 'short-outs' occurring due to the water coming in contact with the power supply. The security lighting system, operated on a battery-powered basis, is not in working order, and there is no emergency power generator to operate the security lighting.

"The inadequate and unsafe lighting and electrical system, in addition to being a fire hazard, has an adverse effect on vision, increasing tension and fatigue among inmates and correctional officers.

## "5. Lack of Cleaning Supplies and Equipment.

"While the Penitentiary is uniformly maintained in an unsanitary and unhealthful condition, as described by the appellants' experts, there is no systematic program of cleanliness, maintenance and repair. The Commissioner of Corrections for the State of Illinois characterized the Penitentiary as: 'The most abysmal over-all conditions he has ever seen.'

"Despite the desperate need to clean and repair the Penitentiary, inmates, who are charged with the responsibility of cleaning their cells and dining areas, are not provided with sufficient and adequate materials to accomplish the task. This condition is acknowledged by Warden Bordenkircher.

"In the general population, inmates are provided with one bucket of water and an insufficient quantity of soap to clean their individual cells. This single bucket is used for twenty (20) separate cells. One (1) mop is furnished for this purpose. Insufficient cleansing material is ... provided to clean or disinfect commodes, sinks or other portions of the individual cells.

"In those areas reserved for punitive and administrative segregation (North Hall), not only are sufficient and adequate cleaning supplies not furnished, but in some cells the only method of cleaning the floor is to 'stop-up' the commode, thus flooding the floor with commode water then commencing the cleaning process.

### "6. Fire Detection, Suppression and Evacuation.

"The entire institution is found to be a fire hazard, and in total non-compliance with existing state fire codes. The Penitentiary lacks an electrically monitored fire alarm system, with an absence of smoke detectors in many of the living areas of the institution.

"If a fire is detected, there is no sprinkling system in many significant areas of the Penitentiary. Suppression devices are totally inadequate in the residential areas. Hand-held fire extinguishers appear to be inspected on an irregular basis and are missing from areas designated for their location.

"The evacuation plan, in the event of a fire, is totally inadequate throughout the Penitentiary. There is no auxiliary power system to unlock the cells at one time. The doors in North Hall are incapable of being opened simultaneously to permit safe egress. Instead they must be opened manually.

"To compound the hazards created by inadequate or non-existent fire detection and suppression devices, no routine fire drills, in a non-emergency situation, are conducted.

### "7. Odor.

"An adjunct to the inferior ventilation system is the permeation of foul odors in all of the cell areas. The odors of sewage and sewer gas pervade all living areas. The lack of adequate ventilation also causes the air to stagnate resulting in inmates retaining body odors, which become particularly pungent when inmates are denied the time to adequately shower in safe, sanitary and healthful facilities.

"This, combined with an inadequate and often malfunctioning ventilation system, also contributes to an odor of human excretion, particularly in the punitive and administrative segregation portions of the Penitentiary.

### "8. Mattresses (Bedding, etc.).

"Each inmate does receive adequate sheets, pillow cases, towels, wash cloths, blankets and pillows, with the replacement scheme found to be adequate.

"However the mattresses, which are provided, are either covered with a cloth cover which is not regularly cleaned, or a vinyl cover, which is flammable, and has in some instances caused skin disorders in some inmates." (Footnotes omitted).

We agree with the Final Order's inescapable conclusion that these conditions constitute a danger to the health and safety of the inmates and render confinement at WVP cruel and unusual punishment. Although the Final Order did not order a specific remedy it did hold that the "physical facilities, due primarily to age, are in such a state of disrepair and obsolescence, that massive renovation bordering on new construction would be required to render the Penitentiary habitable." It ordered the Department to submit a plan that would bring conditions at WVP up to constitutional standards.

The Compliance Plan commits the Department to major renovations, but falls short of "bordering on new construction" as anticipated in the Final Order. The Plan includes measures to control vermin and insects, improvements to the plumbing, heating, ventilating, and electrical systems, better lighting, including outdoor lighting for the recreation area, a weekly cell cleaning routine, a new fire detection system, and plans for fire suppression and evacuation, including additional means of egress, and new emergency exit stairs. The Plan also includes renovating all the cells by installing space saving sink-toilet fixtures and new lighting fixtures, and by painting the cells annually. Five hundred new, fire-resistant mattresses will be purchased for inmates. Plans are also made to either

convert the Old Men's Colony (OMC) to a gymnasium for North Hall inmates and to build a new OMC or to build a new gymnasium for North Hall. All of these renovations are planned to be completed by the end of fiscal year 1989.

The Consent Decree prohibits confining more than one inmate to a cell except in emergencies. However, the Plan does not call for an increase in the size of the cells. Although the Final Order did not mandate a particular minimum cell size that would meet constitutional standards, it did determine that "[t]he current living arrangement of thirty-five (35) square feet, sixty percent of which is occupied by fixtures and furnishings, falls below accepted standards of minimum space 'to call one's own.'"

The Department contends that under the Final Order, cell size would not have to be increased as long as other conditions of confinement are improved, such as opportunities for recreation, educational and vocational programs, and time spent outside the cell. It contends improvements have been planned in each of these areas.

We have examined the plans for recreation, education, and rehabilitation, and found the plans fall short of the requirements established in the Final Order. Although the Compliance Plan claims to reduce in-cell time to ten hours per day, opportunities for recreation or education outside the cell are insufficient to actually enable the general population to be out of their cells for a daily fourteen-hour stint. Moreover, the configuration of the cells in tiers provides little space outside the cell in

which to congregate. Inmates in segregation have even less opportunity to move about being confined to their cells fourteen to seventeen hours per day.

There is no federal or state constitutional standard that determines the precise minimum dimensions for prison cell size. There are, however, other standards established not out of constitutional considerations, but out of humanitarian and decency considerations, that recommend between fifty and eighty square feet per inmate.[16]

Courts that have dealt with this issue have not all agreed on the minimum amount of living space that is required by constitutional standards of decency. For example, in *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *aff'd in part*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), the court required a minimum of sixty square feet per inmate and eighty square feet for those who are confined to their cells for twenty hours or more per day. In *Battle v. Anderson*, 564 F.2d 388 (10th Cir.1977), the court characterized a thirty-five square foot cell a "cubbyhole" and mandated the prison to adopt the American Public Health Association's standard of sixty square feet in a cell and seventy-five square feet per inmate in a dormitory. In *Pugh v. Locke*, the court required sixty square feet, and in *Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975), the court required fifty square feet per inmate. Some courts have approved cell sizes of less than fifty square feet per inmate. *See Taylor v. Sterrett*, 344 F.Supp. 411 (N.D.Tex.1972), *modified*, 499 F.2d 367 (5th Cir.1974), *cert.*

---

16. *See* Pooler, *Prison Overcrowding and the Eighth Amendment: The* Rhodes *Not Taken*, 9 New Eng.J.Crim. & Civ.Confinement 1, 24 n. 168 (1983), which identified the following standards: Department of Justice, Federal Standards Prisons and Jails § 2.04, at 17 (1980) (60 sq. ft. per inmate); Model Sentencing and Corrections Act § 2–7404(3) (1978) (70 sq. ft. per inmate); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners § 1 (50 sq. ft. per inmate); National Advisory Commission for Criminal Justice Standards and Goals, Corrections, Standard 11.1, at 353 (80 sq. ft. per inmate); National Sheriff's Association, Handbook on Jail Architecture 63 (1975) (70 sq. ft. per inmate); National Clearinghouse for Criminal Justice Planning and Architecture (70 sq. ft. per inmate); American Public Health Association, Standards for Health Services in Correctional Institutions 62 (1976) (60 sq. ft. per inmate); American Correctional Association, Manual for Standards for Adult Correctional Institutions § 4142 (1977) (60 sq. ft. for inmates in cell ten hours or less a day, 80 sq. ft. for inmates in cell more than ten hours); Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners § (9)(1) (1955) (one inmate per cell); International Conference of Building Officials, *Uniform Building Code* § 1307B, at 83 (80 sq. ft. per inmate).

*denied,* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975) (approved forty square feet); *Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980) (required forty-three square feet if inmate held for one week or more); *Johnson v. Levine,* 450 F.Supp. 648, *modified,* 588 F.2d 1378 (4th Cir.1978) (approved forty square feet); *Cooper v. Morin,* 91 Misc.2d 302, 398 N.Y.S.2d 36 (1977) (approved forty-eight square feet per inmate, but on equal protection basis).

The United States Supreme Court has indirectly considered the issue of adequate cell space when it was asked in two recent cases whether it was constitutional to confine two inmates to a cell designed for one. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court approved double-bunking in a seventy-five square foot cell, thus giving each cellmate thirty-seven-and-a-half square feet. However, the facility in the case was brand new and " 'represented the architectural embodiment of the best and most progressive penological planning.' " 441 U.S. at 525, 99 S.Ct. at 1866, 60 L.Ed.2d at 459, quoting from 573 F.2d at 121. Instead of barred cells, it had private rooms and dormitories adjoining a large multipurpose room. Inmates were free to leave their rooms any time except during sleeping hours. Furthermore, no inmates remained long in the facility because it was used for pretrial detainment. The United States Supreme Court considered these factors and determined double celling did not deprive pretrial detainees of their liberty without due process of law.

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the United States Supreme Court was asked to determine whether double celling in an Ohio maximum security prison was cruel and unusual punishment. The United States Supreme Court approved double-bunking in a sixty-three square foot cell, thus giving inmates thirty-one-and-a-half square feet each. However, as in *Bell v. Wolfish, supra,* the United States Supreme Court noted the facility was new and modern with adjoining comfortable day rooms open to the inmates from 6:30 a.m. to 9:30 p.m.

Likewise, in *Hite v. Leeke,* 564 F.2d 670 (4th Cir.1977), the court approved double-bunking in sixty-five square foot cells where the facility was modern and no other forms of cruel treatment were found.

■ From these cases, it is clear that the acceptable minimum cell size depends on three factors: (1) basic standards of decency to which a state adheres in its prison conditions; (2) the duration of time an inmate must spend inside the cell; and (3) the opportunities and conditions outside the cell that provide an inmate with relief from the discomfort of in-cell confinement.

The record shows that WVP cells consist of only thirty-five square feet of which sixty percent (60%) is occupied by physical objects such as the bunk, commode, and wash basin. There are no adjoining areas or multipurpose rooms to which an inmate may go to for relief from his limited in-cell quarters. Recreational facilities are lacking, especially during inclement weather.

■ Given these conditions, we are compelled to rule that confinement to a thirty-five square foot cell for up to ten hours per day, without adequate opportunities or incentive to get out and move about in a larger area constitutes cruel and unusual punishment. Only where such adjoining areas have been available or when the facilities were modern have courts held that such small cell sizes were constitutionally permissible. Otherwise cell size must be increased significantly where conditions in-cell and out-of-cell are below modern standards such as they are at WVP. Therefore, we believe and find overwhelming support for the conclusion that given the overall conditions at WVP, even assuming the improvements contemplated by the Compliance Plan, inmates at WVP would continue to suffer cruel and unusual punishment if cell size is not increased.

Given the limited space currently available in the Moundsville facility and the overpopulation of inmates, we cannot envision how it would be economically feasible to increase the cell size within the confines of the existing structure. If the State is to meet its constitutional duty to refrain from

inflicting cruel and unusual punishment, then it must cease confining inmates at WVP to cells measuring only thirty-five square feet. Therefore, we hold that the circuit judge erred in approving the Compliance Plan that neither included increasing cell size nor "massive renovation bordering on new construction," as the Final Order required,. such as providing adjoining areas and adequate recreational facilities to offset the harsh effect of such close confinement.

## IV.

### FUTURE REMEDIAL ACTIONS

In this section, we address what future remedial actions need to be taken. It is apparent that the Compliance Plan insofar as it relates to the physical facilities must be revised by the Department of Corrections to include the development of new facilities. The ground work exists in the detailed report prepared by Kimball & Associates which is an exhibit in this record and which was given to the Legislature in 1982 with its subcommittee's recommendation that the "modified ideal plan" as identified therein be adopted. This plan envisioned that new facilities would be constructed in a series of phases which would alleviate the entire cost falling in one fiscal year.

We believe that it is feasible for the Department to submit a revised Compliance Plan within 120 days from the mandate of this opinion. We also conclude that a Special Master should be appointed to whom the plan should be submitted and who will review it and furnish this Court with a report and recommendations. By having the Special Master report directly to this Court, it is hoped that this matter may move more expeditiously than requiring it to be handled by a circuit judge. Our mandate appointing the Special Master will also define his duties.

In the interim, the Consent Decree previously agreed to by all parties and entered on July 21, 1983, shall remain in force. This Decree dealt with the appointment of a Special Master who was in effect a monitor and we hereby change his designation to Monitor in order to avoid confusion with the Special Master that we have appointed. The Consent Decree dealt with matters that had no substantial bearing on the structural facilities and related to classification, education and rehabilitation programs, good time credit, correspondence and telephone privileges, visitation, grievance procedures, and inmate's property and funds.

These aspects of the existing Compliance Plan which do not call for substantial renovation of the existing facilities should be continued. The Department is under a duty to apply to the Special Master for specific guidance if it is in doubt as to what aspects of the existing Compliance Plan should be discontinued in order to avoid substantial expenditures on the facilities which will be corrected through the revised Compliance Plan.

Finally, we continue the utilization of the Monitor to ensure that continued compliance is being made. As we have earlier noted, see note 2, *supra*, his reports are filed with the designated circuit judge, and the appellants through their counsel may petition to have the circuit court issue a rule to show cause. If at a subsequent hearing on the return of the rule, it finds the Department to be in violation of the underlying order, it may impose appropriate sanctions.

It is not necessary at this point to go into a detailed discussion of the remedies available to a court when confronted with unconstitutional jail conditions.[17] We con-

---

17. Possible remedies include: (1) closure of unconstitutional facility: *Miller v. Carson,* 563 F.2d 741, 747–48 (5th Cir.1977); *Ramos v. Lamm,* 485 F.Supp. 122 (D.Colo.1979), *aff'd,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Hamilton v. Landrieu,* 351 F.Supp. 549 (E.D.La.1972); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.), *supplemented,* 377 F.Supp. 995 (S.D.N.Y.) *aff'd,* 507 F.2d 333, 340 (2d Cir.1974); *Palmigiano v. Garrahy,* 443 F.Supp. 956, 984 (D.R.I.1977), *remanded,* 599 F.2d 17 (1st Cir.1979); (2) ordering inmates released to alleviate overcrowding: *Ruiz v. Estelle,* 679 F.2d 1115, 1148 (5th Cir. 1982), *modified,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75

ceive that all responsible public officials realize the need to rectify the conditions at WVP. Many courts have reiterated the thought expressed in *Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72, 81 (1977), that the economic "cost of protecting a constitutional right cannot justify its total denial." [18] We elaborated on this theme in *Cooper v. Gwinn*, 171 W.Va. at 256, 298 S.E.2d at 793:

"The incarceration of individuals who have broken society's laws is a public act for which the people through their government must take ultimate responsibility....

"In recognition of this responsibility, our Legislature has said that inmates incarcerated in state prisons shall be rehabilitated through programs of classification, education and treatment. A plea of lack of funds is an insufficient justification for the failure of the executive department to implement this mandate. 'Politically motivated pleas of public poverty cannot be used to brush aside the fundamental duties of government to the maintenance of civilization....' *Moore*

*v. Starcher*, [167 W.Va. 848, 853, 280 S.E.2d 693, 696 (1981) ]."

In the final analysis, these concerns should not be left to the judiciary, as an enlightened body politic should be expected to render habitable conditions of confinement to those who have become wards of society. Too often the easy rhetoric of castigation and vengeance is allowed to mask the fact that many of those confined will respond to rehabilitation. If all that is offered is degradation then the positive aspects of the human spirit are soon extinguished. Confronted as we are with this task, we decline to abandon it to our brethren in the federal system as we would then concede our inability to do our constitutional duty.

We end as we began by observing that the issue of whether the conditions at WVP constitute cruel and unusual punishment is not before us on this appeal. This issue was settled in the Final Order of Judge Recht dated June 21, 1983, which was never appealed to this Court. The only issue before us is whether the appellees' Compli-

---

L.Ed.2d 795 (1983); *Battle v. Anderson*, 564 F.2d 388 (10th Cir.1977); *Costello v. Wainright*, 397 F.Supp. 20 (M.D.Fla.1975), *aff'd*, 525 F.2d 1239 (5th Cir.1976), *vacated on reh'g*, 539 F.2d 547 (5th Cir.1976), *rev'd*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977); *Jones v. Wittenberg*, 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom.*, *Jones v. Metzger*, 456 F.2d 854 (6th Cir.1972); *Hamilton v. Love*, 328 F.Supp. 1182, 1194 (E.D.Ark.1971); (3) proceeding by way of contempt: *Mobile County Jail Inmates v. Purvis*, 551 F.Supp. 92 (S.D.Ala.1982), *aff'd*, 703 F.2d 580 (11th Cir.1983) (imposed five thousand dollar fine for each day the authorities were out of compliance); *Miller v. Carson*, 550 F.Supp. 543 (M.D.Fla.1982) (imposed ten thousand dollar fines on defendants in their individual and official capacities for failure to implement court order to eliminate prison overcrowding); *Palmigiano v. Garrahy*, *supra* (imposed one thousand dollar a day fine for noncompliance); (4) ordering a new facility: *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass. 1973), *aff'd*, 494 F.2d 1196 (1st Cir.1974), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Hamilton v. Landrieu, supra.* *See, e.g.,* Frug, *The Judicial Power of the Purse,* 126 U.Pa.L.Rev. 715 (1978); Hirschhorn, *Where the Money Is: Remedies to Finance Compliance with Strict Structural Injunctions,* 82 Mich.L.Rev. 1815 (1984); Starr, *Accommodation*

*and Accountability: A Strategy for Judicial Enforcement of Institutional Reform Decrees,* 32 Ala.L.Rev. 399 (1981); Special Project, *The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 784 (1978); Note, *Complex Enforcement: Unconstitutional Prison Conditions,* 94 Harv.L.Rev. 626 (1981); Comment, *Confronting the Conditions of Confinement: An Expanded Role for Courts in Prison Reform,* 12 Harv.C.R.–C.L.L.Rev. 367 (1977).

**18.** In *Dawson v. Kendrick*, 527 F.Supp. 1252, 1283 (S.D.W.Va.1981), which involved the conditions of the Mercer County Jail, this statement was made:

"Once a state legitimately deprives a person of his liberty, it is required to shoulder the economic burden necessary to preserve the constitutional rights retained by the person within the walls of the jail or prison. *See Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir.1979), *further proceedings*, 614 F.2d 251 (10th Cir.1980); *Burks v. Teasdale*, 603 F.2d 59, 62 (8th Cir.1979); *Todaro v. Ward*, 565 F.2d 48, 54 n. 8 (2d Cir.1977); *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir. 1980); *Nadeau v. Helgemoe*, 561 F.2d 411, 417 (1st Cir.1977); *Johnson v. Levine*, 450 F.Supp. 648, 654 (D.Md.1978), *aff'd*, 588 F.2d 1378 (4th Cir.1978)."

ance Plan approved by the successor special judge on September 1, 1984, meets the detailed provisions contained in the Final Order.

We find that it does not in all respects and, therefore, assign to the Special Master the role of approving a new Compliance Plan to be submitted by the appellees in accordance with the dictates of this opinion within 120 days from the date of the mandate of this Court. The remaining portion of this case is remanded to Special Judge W. Craig Broadwater who is designated to hear such matters as may be brought before him with regard to monitoring those portions of the original Compliance Plan which have been found to be acceptable in this opinion.

Remanded.